QUINCY A. SHAW MCKEAN AND MARGARET S. MCKEAN (HUSBAND AND WIFE), PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8063.   Promulgated April 17, 1946.

*Edward J. Keelan, Jr., Esq., J. N. Welch, Esq.,* and *Anthony Brayton, Esq.,* for the petitioners.

*A. J. McDowell, Esq.,* for the respondent.

**OPINION.**

ARUNDELL, *Judge*: The parties agree that the petitioner realized a net gain of $20,324.97 in 1940 as a result of the compromise settlement. Hence, the only question before us is whether that sum represents a long term capital gain, as the petitioner contends, or whether it is ordinary income, or, in the alternative, a short term capital gain, as contended by the respondent.

The money in question was capital gain unless, as is urged by the Commissioner, all or some part thereof was received by petitioner as commission for services rendered by the brokers to Bird in connection with the purchase of the Quimby Co. stock. We have found as a fact that the Ridgeton Corporation was employed on a commission basis by the seller of the stock and that neither petitioner, Burnhome, nor the corporation was employed by Bird or received any commission or compensation from him in connection with the sale. The entire profit on the transaction was derived from the investment by the brokers in one-half of the stock ultimately received by Bird. Thus, the profit derived thereon was capital gain.

The memorandum agreement between the brokers and Bird, dated February 9, 1932, expressly provided that the brokers should receive one-half of all the Quimby stock received by Bird, after deducting the financing costs and the taxes in connection with the purchase. It specifically provided that $24,851.23 was the amount actually paid to Bird for the stock. The agreement further provided that if the brokers should, at any time prior to the actual division of the stock, become dissatisfied, Bird would pay them $24,851.23 instead of turning over any of the Quimby stock.

The transaction may not be regarded as the acquisition by the brokers of a mere option. It is obvious that in the circumstances here it must be regarded either as a loan or a purchase, and that it can not be both. Nor may the selection of the characterization of the transaction be said to have been at the brokers' election. It seems clear that it was not a loan, and neither party suggests that it was a loan. See *Irving Fisher*, 30 B. T. A. 433; *Resthaven Memorial Cemetery, Inc.*, 43 B. T. A. 683; *William H. Davey*, 30 B. T. A. 837. Under the contract the broker made an investment in the stock, they acquired a present

beneficial ownership therein, and, pending the clearing up of Bird's financing obligations and the taxes in connection therewith, the brokers were entitled to the dividends on their shares. The fact that the shares could not at that time, and as a matter of fact never did, come into their physical possession is entirely immaterial. *I. C. Bradbury*, 23 B. T. A. 1352; affd., 78 Fed. (2d) 599. They were the equitable owners of one-half of the shares that Bird had acquired. Nor does the fact that the brokers could, at any time prior to the actual division of the stock, compel Bird to return to them their investment in lieu of turning over the stock alter the situation. In contracts of this nature such an arrangement is not unusual. As we pointed out in the *Resthaven Memorial Cemetery* case, *supra*, the existence of an obligation on the part of the seller to repurchase is entirely consistent with the theory that the transaction was a sale on condition subsequent. Such a provision does not vitiate the sale. *John Sherwin*, 46 B. T. A. 330. It is merely a right to rescind the original completed sale. *James H. Torrens*, 31 B. T. A. 787.

We conclude that by the transaction the brokers acquired an economic ownership of one-half of the stock acquired by Bird. There is no evidence that the brokers ever manifested dissatisfaction with their purchase or attempted to compel Bird to repurchase their interest. Indeed, the equity proceeding instituted in 1939 was for the purpose of compelling Bird to deliver one-half of the stock.

By the compromise agreement of 1940, the brokers relinquished their right and interest in the Quinby Co. stock for a total payment of about $125,000, and that settlement constituted a sale or exchange within the meaning of the applicable statute. See *I. C. Bradbury, supra*. It appears from the record that Bird completed the purchase and came into possession of the Quinby Co. stock early in 1932. The brokers' right to one-half of Bird's stock attached at the time of its receipt by him and, hence, it appears that the brokers had, in fact, been the equitable owners for a period far in excess of the 18 months necessary, in 1940, to support a long term capital gain.

Turning to the question of petitioner's basis in 1940 for depreciation on the Commonwealth Avenue Building, we note that the parties are agreed that the basis is the fair market value at the time of its conversion to rental property. *Heiner* v. *Tindle*, 276 U. S. 582. Since the parties are likewise agreed that 3 percent is the proper rate for the computation, the only problem before us is its fair market value at the crucial date.

The respondent has determined that the value of the whole property was $21,600, attributable $10,152 to the building and $11,448 to the land. In his tax return for 1940, the petitioner claimed a basis of $48,000 on the building. However, for purposes of computing gain or

loss on the sale thereof in 1941, he claimed that its fair market value upon conversion was $28,000.

Upon consideration of the testimony of expert witnesses, each of whom tended in his opinion to support the determination of the party by whom he was called to testify, and upon consideration of rental value, assessed valuation, and all other pertinent factors, we have found as a fact that the fair market value of the entire parcel was $45,000, and that of that sum $25,000 was attributable to the building and $20,000 to the land.

During the years prior to 1940, petitioner claimed and was allowed depreciation of $1,440 annually (3 percent on a claimed basis of $48,000). Since the amount allowed in each of those years is in excess of the amount allowable under this determination, the amount of depreciation so allowed must stand. For the year 1940 depreciation should be recomputed on the basis of a value of $25,000, the fair market value as herein redetermined.

In ascertaining petitioner's adjusted basis on the building for purposes of determining loss on the sale thereof in 1941, the depreciation reserve should be reduced by the sum of $1,970.40 representing expenditures by petitioner in 1937 for electrical wiring, plumbing, and alterations. That sum has not otherwise been accounted for and it was understood that such amount should be applied in reduction of the depreciation account.

At the time of the sale in 1941 petitioner's basis (unadjusted) for the building was $25,000 and his basis for the land was $20,000. It is agreed that the land was a capital asset. The respondent has taken the position that the loss on the building, as well as that sustained on the land, was a long term capital loss. In support of his contention he argues that the building may not be excluded from characterization as a capital asset since, while it was subject to an allowance for depreciation, it was not used in a trade or business carried on by petitioner, hence, that it fails to meet one of the requirements and must, therefore, be regarded as a capital asset. We considered the same problem in *N. Stuart Campbell*, 5 T. C. 272, and there held that the loss attributable to a building was an ordinary loss. We find no reason for holding contrary to that decision, nor does there appear to be any material basis upon which this case might be distinguished from it. Accordingly, we hold that the loss attributable to the building was an ordinary loss.

Of the net sale price in the amount of $7,600, the sum of $3,420 should be allocated to the building and the balance, $4,180, should be allocated to the land.

Reviewed by the Court.

*Decision will be entered under Rule 50.*